States of America v. Robert Ricks. Is the appellant ready to proceed? Yes, Your Honor. You may. Good afternoon, and may it please the Court. Avery Pardee on behalf of Robert Ricks. I'd like to talk first about the government's substantial interference with defense witness Mandy Malbrou. The trial court's factual finding that there was no substantial interference is reviewed for clear error, and the Constitutional violation is reviewed for whether it's harmless. That is, whether the Court is convinced beyond a reasonable doubt that notwithstanding the error, Robert received a fair trial, or put another way, whether there is any reasonable possibility that there would have been a more favorable result on any of the charges of which he was convicted, either the drug charges, the conspiracy charges, or the gun charge. The government cannot combine a standard perjury admonition with a statement by the agent to the witness that I believe that what you just said is a lie, and if you testify to what you just said under oath, you will be committing a Federal offense, because the witness perceives that to be the threat that it is. You either need to change your testimony, or you need to decide not to testify, and if you do not, you subject yourself to the risk of Federal prosecution. Well, isn't that pretty standard? You tell a witness, if you lie to the Court, we're going to prosecute you. A standard perjury... There's some basis for saying that. A standard perjury admonition can be given at the beginning of a witness interview, but it should not be combined. It should not be given in response to the substance of a witness's statement. And that concern goes back to the foundational case, Webb v. Texas, where the trial court judge singled out a defense witness for perjury admonition, and he, quote, implied that he expected the witness to lie. It's that expression by... That was in front of the jury, wasn't it? It was, but the concern was... That's a difference. I'm sorry? That's a major difference. I think the concern with substantial governmental interference is with the impact that it has on the defense witness, and that defense witness's decision whether or not to testify or not. In Webb v. Texas, that witness ultimately decided not to testify, and so it wasn't looking at what the impact was on the jury, but what the impact was on that witness. And so what we have here is that Agent Kalagna testified at trial. He admitted that he met with Mandy Malbry twice. The first time was while she was charged as a co-defendant with Robert Ricks in state court, while she had those charges pending. Kalagna admits that he circumvented her lawyer. He scheduled that meeting without her lawyer's knowledge or presence. And he interviewed her about her co-defendant, Robert Ricks. Kalagna admitted during his trial testimony that Mandy said during that meeting that the gun was hers and that the drugs were hers and that Robert had nothing to do with it. Kalagna denied threatening her with prosecution during that first meeting. Mandy says that she did. But what's more significant is Kalagna's testimony about the second meeting, which is after Mandy had pled guilty in state court while she was serving her sentence. Kalagna had her brought down to testify in front of the grand jury, and he met with her. He testified again that Mandy said that gun was hers, those drugs were hers, and Robert had nothing to do with it. And Kalagna testified, quote, that she'd be committing perjury in a federal grand jury. And that is an improper perjury admonition. That is the agent telling Mandy in response to the substance of what she's planning to say, if you say that, you will be charged with perjury. The agent tried to cure that threat by seeking use immunity for Mandy Malibu, but it was ineffective. The use immunity order carved out from its protections a prosecution for perjury, which is the precise charge that the agent had threatened Mandy with. And as the Ninth Circuit said in the badges, it doesn't take much of an interpretive gloss for the witness to recall, I was threatened with a perjury prosecution to look at that grant of use immunity and to see at the bottom that she's still subjected to the threat of a perjury prosecution. On the facts of this case, the agent's admission that he threatened her with a perjury prosecution, it was clear error for the trial court to find, as a matter of fact, that there was no substantial interference. And the error was not harmless. Mandy's testimony would have been crucial to the defense. I think the prejudice to the defense is most apparent with respect to the gun charge. The gun was recovered during the execution of a search warrant at 1201 Belleville. It was found in a drawer near the entrance to the bedroom that they shared together. It was not in Robert Rick's person when that happened. It was in his sock drawer. Excuse me? It was in his sock drawer. It was in a shared little plastic chest of drawers. It was wrapped inside of a sock, and it was a small little gun. There were both Mandy's and Robert's things in that little chest of drawers. But it was not on him when that search warrant was executed or when he was arrested. The government called one witness to try to prove that Robert had possessed that gun, either as a felon or in connection with one of these drug trafficking offenses, and that was Torrey Cargo. Torrey Cargo was a cooperating witness. He was in jail at the time, and he was cross-examined extensively at trial with the fact that when he testified in front of the grand jury, he denied having seen Robert Ricks with a gun. When the evidence of possession of a firearm is as tenuous as it was in this case, the court cannot be convinced beyond doubt that Mandy's testimony wouldn't have made a difference. As to the drug charge, it is, I think, a heavier lift for the defense there. But Mandy's testimony would have been corroborated by the fact that she was separately arrested selling drugs during a time period that Robert Ricks was in jail. She was arrested on Iberville Street, charged, pled guilty. She entered that guilty plea to her Iberville drug charges on the same day that she entered her state court guilty plea in connection with the 1201 Belleville charges where she was charged jointly with Robert. When we attempted to elicit from the case agent the fact that Mandy had been selling drugs separate and apart from Robert while Robert was in jail, the government objected to that line of questioning, and the trial court sustained it. So we were really precluded from putting on the full defense that we opened on and that we expected to be able to present that Mandy Malibu was herself a drug dealer and that Robert was not. Well, she pled guilty to dealing drugs. She did, and we were able to elicit the fact that she pled guilty in Robert's case. We also elicited the fact that she pled guilty to Iberville, but we were not able to elicit the facts of that Iberville plea. And as set forth in the defense investigator's affidavit, Mandy's testimony would have been more fulsome than that. She was planning to testify that she was holding the drugs that were recovered from 1201 Belleville for her co-defendant from the Iberville Street case, you know, after she and that defendant had broken up when Robert got out of jail. So we have this threat. We have this improper perjury admonition. We have the causation proven in the statement of the defense investigator where Mandy says, I was willing to testify. I was willing to testify truthfully but for the fact that the agents threatened me with prosecution. Is the entirety of the threat for prosecution the agent's testimony at trial? Or is there a different threat? It's a different threat. The agent's testimony at trial was an admission that he had threatened Mandy previously when she was brought down to testify outside of the grand jury. So the issue is not that the threat that the agent made at trial was conveyed to Mandy. It's the fact that the agent admitted at trial that he had threatened Mandy previously. And what was the context in which he threatened her previously? She had been subpoenaed and written down to testify outside of the grand jury. Agent Kalagna and his partner Evanoski and the AUSA met with her outside of the grand jury. She told the agent again that the gun was hers and the drug was hers, and Robert had nothing to do with it. I mean, like, was it an interview room or? I don't know that we know that. We did request any interview memos that were generated as a result of the agent's two meetings with Mandy and Kalagna testified that they did not generate any interview memos. So we really don't have a record beyond what Kalagna testified to and Mandy's statements to the defense investigator. And those two confirm each other with respect to the conversation outside of the grand jury room. Kalagna, again, denies that he threatened her during the first meeting. Mandy says that he did threaten her during that first meeting. Thank you. I'd like to turn next to the Rule 16 violation. Again, the case agent testified on direct. And I'm sorry, the issue here is that the government did not turn over, as Rule 16 statements of the defendant, Robert's recorded jailhouse calls. The case agent testified on direct that he had listened to a number of jail calls by unindicted alleged co-conspirators. The government introduced one of those jailed calls. He testified about it on direct. And in an attempt to meet that evidence, we wanted to cross-examine the agent about the absence of inculpatory jail calls of Robert's. And during that cross-examination was the first time that we learned that the agent had, in fact, listened to his jail calls, but none of those had been turned over. We objected. We went to the bench and let the judge know that we can't intelligently cross-examine this agent if we haven't gotten the jail calls ahead of time. Did you ask for the jail calls ahead of time? We did. I mean, we made a general Rule 16 discovery request. It was not specific to the jail calls. But obviously those calls weren't in the custody of the U.S. Attorney's Office, right? That's not right. Kalagna was the investigating case agent for this case. He logged onto a BOP database, and he listened to those calls. The cases that the government cites in its brief say that the AUSA is presumed to have knowledge of all of the evidence collected by those on its prosecution team. It's not required that BOP be a part of the prosecution team for the government to be obligated to turn that over. And what did the general Rule 16 request ask for? Statements of the defendant. Statements of the defendant just generally? That would include things he was saying to his friends or family on the phone? I don't recall specifically what the Rule 16 request was. Obviously he would know about his phone calls. I mean, he was on the phone. He would know about the existence of the phone calls. But the substantial right impacted is the ability for us to intelligently cross-examine the case agent. We would have no ability to impeach him, to limit his testimony if he mischaracterized those phone calls or got a little creative with them. Did he tell you about the phone calls? Did your client tell you he had those phone calls in jail, which are always recorded and usually listened to? No. But going back to the issue of whether they were in the possession of the government, United States v. Avellino, which is one of the cases that the government cites, they are presumed to have possession of those evidentiary matters that their case agent obtained, listened to. This is not something where we're asking them to produce things that he did not listen to. But if he reviewed them and if he testified to calls on direct, we're entitled to the jail calls that we had requested. The final error that we raised is the denial of the motion to continue, which I know is kind of the most difficult of the three errors that we raised. The motion to continue we filed after the government disclosed on their Thursday evening before a Monday morning trial that the NOPD officer who had conducted the surveillance was suffering from a brain tumor that affected her vision. That disclosure was made along with the conclusory statement, but don't worry, it wasn't affecting her vision at the time that we conducted the surveillance. Without the opportunity to investigate that, we really couldn't do anything with it. The other late disclosure that was the basis of our motion to continue was the identity and the photographs of numerous other young black men who the government believed were dealing drugs on the same block. Again, we would have needed the opportunity to investigate that better to shore up our attack on the identifications that were made by some pretty reluctant street-level drug customers who the government called in to identify our client. Well, weren't they the ones participating in the buy, in the drug transaction? There were some who were participating in drug purchases. There were others who said that they heard Robert offering drugs. It was difficult for the government to elicit those identifications from those individuals, so it would have been helpful to us to better attack their identification if we could have more information about the other individuals, young black men about Robert's size, who were known to the government to be dealing drugs on that same block. Who saw Rick stealing drugs? There were, I believe, three street-level purchasers who testified that they saw Robert dealing drugs. There was an NOPD officer who conducted surveillance as well. Who actually testified that the officer saw him dealing drugs? Yes, the officer testified that she saw him dealing drugs. She was the same officer who was suffering from the brain tumor that affected her vision. And that was the only officer? Yes, she testified that she saw him dealing drugs. She radioed to other officers who then arrested the people who were believed to have participated in those transactions. But she was the only one who testified that she laid eyes on Robert. All right. If there's nothing further, I'll wait for rebuttal. Thank you, Counsel. Thank you. Appellee. Good afternoon. May it please the Court. As to the first issue about the substantial interference, the government didn't substantially interfere with the defense ability to call Mandy Marlborough, his girlfriend. We obtained statutory immunity for her. They simply chose to never call her. And when appellate refers to the factual finding, there are no factual findings in the record about whether or not Ms. Marlborough chose to testify or why she didn't testify. She was simply never called. Was she incarcerated? No. She was present outside the courtroom. They opened that we didn't think you were going to hear from her, but now we have statutory immunity. We got that because she literally couldn't refuse to testify. Once you have statutory immunity, you have no claim to the Fifth. This Court in the United States v. Whittington held that you can't claim the Fifth on a potential perjury charge, that if you want to claim the Fifth on a potential perjury charge, you just have to tell the truth. No one called her. Excuse me? No one called her. Exactly. We considered calling her, but she had a lot of incriminating information. We presented the case as her as an unindicted co-conspirator. The defense could have called her. I think they didn't call her because they got in the stuff about the other boyfriend and her pleading guilty through the cross-examination of the case agent. There was never a point subsequent to his testimony. And the way that I understood their brief, just to back up, was that the first two meetings were cured by us getting the immunity, and then it was the case agent's testimony during the trial that somehow caused her not to testify, which there was no support for. She was sequestered. She wasn't in that. Of course not. She was sequestered from the courtroom. They apparently related to her. I don't know how she came to know what he said during this testimony, but she never came in and said to the district judge, I don't want to do this, I don't want to testify. The defense never said we're trying to call her and she's refusing. We never even talked to her. So there's absolutely nothing in the record, and that's critical because the burden is on the defense not to show correlation but for causation. And when you have literally nothing as to why she didn't want to testify, there's no way you can establish that. And if you look at the cases like the Webby, Texas, Morrison is another one, those cases are absolutely egregious where multiple repeated interactions, issuing a fake subpoena, coming in with a meeting with multiple law enforcement people and really just intimidating the witness. Here, this is the defendant's girlfriend. The agent is trying to be a good guy. Don't go in and perjure yourself and pick up a charge. All of the evidence points to Robert. I mean, the whole reason that to Robert Ricks, the defendant, I mean, there's literally a picture of them that was posted on the day that the NOPD officers were doing the surveillance where it says new addition Bonnie and Clyde, self-made power couple. That was not with Pig. There were hundreds of messages with Robert Ricks about 500 messages within like a five-day period, including 20 messages between midnight and 5 a.m. on the day of the search. The drugs were messages from who to who? From Robert to people like white boy SMK or, you know, plays on smack, which is a street word for heroin, you know, 10-second phone calls, calls that are consistent with drug trafficking activity, and then the drugs in the bedroom are found all hidden in the men's clothing. It would be very strange to hide drugs from a different boyfriend in the men's clothings of the boyfriend that's living with you. And his ID, Robert Ricks' ID, was literally found in a pile of cocaine on the shelf. I mean, it was ludicrous to claim that the drugs were Pig's. And the reason they didn't call her was not because we kept her off the stand. We enabled them to call her. They didn't call her because she would have been subject to devastating cross-examination, and they got in the facts that they needed through the cross-examination and the case agent. Now, moving on to the jail calls, there is a distinction between the prosecution team is what defines custody and control, and there's cases from this circuit that are cited in my brief where the jails where inmates are held are not part of the prosecution team unless it's a case, say, about something that happened in the jail. This whole case was about what happened on the street before he ever got arrested. The defendant was detained, I think, for maybe four months or something between when he got arrested. He moved to reopen a detention hearing. He got bond, and then he was out on the street for maybe a year or a little bit more before the trial. Would defense counsel have requested to listen to the tapes? Absolutely, and whether or not the jail would have given it to him without a subpoena, here he was a participant in all of those phone calls, so he could have issued a subpoena. I don't think we would have been able to quash a subpoena that if he knows what's on the calls and they were somehow important, he wouldn't be able to meet the specificity requirements of Nixon to issue subpoenas. I mean, the thing is the agent listened to him. It's the defendant talking to his friends and family that has nothing to do with the case. It was going nowhere. We didn't try and introduce any of the defendant's own phone calls. They were completely irrelevant, which Rule 16 isn't just all statements, any and all statements. It's relevant statements. There's been no showing made that anything on those tapes was relevant at all to the case, and the point that they were trying to— So there was no testimony about what was on the tapes? On the defendant's tapes, none at all. The point that the defense was trying to make, we introduced co-conspirators named Apple and Butter. They had a call in which Butter calls Apple and says, go pick up the $500 from Robert Ricks, the defendant. We introduced that to show that here in Apple's numbers in his phone, here's his co-conspirators trying to go pick up money from him further into the conspiracy statements. And then the defense's point was going to be, hey, you heard these calls from Apple and Butter. You didn't hear any calls from Robert. Ergo, Robert's not a drug dealer. Those guys are the drug dealers, which is he literally said that exact same thing to the jury. You heard calls from Apple and Butter. You didn't hear any calls from Mandy. You didn't hear any calls from Robert. That, ladies and gentlemen, is reasonable doubt. That is almost a verbatim transcript from his closing argument. So, I mean, he got to make the point. All the stuff about not wanting to wade into traffic and the cross, I mean, he made the point in the cross that he was trying to make, and he reinforced it in the closing. I don't know if you guys want to hear anything about the continuance. There are a few things I wanted to clarify briefly. The officer that made the observations was working in a team with other officers. She watched a drug deal go down involving the defendant. She radioed her partners. They stopped the people that she had seen. They got heroin off one of them. They got a Xanax without a prescription off the other. Those people both testified during the trial that, yes, we were meeting with Robert Ricks at the time the officer observed the meeting with him, right before they got arrested. The officer testified herself. She said that her vision problems arose a couple months after the surveillance. We introduced body cam footage of the search warrant that occurred four days after the surveillance, and she's on her hands, like, picking up little bitty packets of heroin, you know, with no vision problems whatsoever. You know, she's able to see in this room at 6 o'clock in the morning and find these little packets of heroin. It was corroborated over and over, and in any event, they got to make the point that identity might be an issue. The thing was he wasn't charged with the distributions that she observed, right, for the five counts related to the items that were found in the bedroom, and there was no doubt that the defendant lived in the bedroom. He didn't contest that. So all of that had to do with joint constructive possession of the items. So she didn't testify at the trial about the distribution? She did testify about the distributions, but the defendant was not charged with those distributions. But she testified about them? Yes, she did, and her testimony about seeing him was corroborated by the buyers that she radioed to her partners to stop who said they were actually meeting with him. So they tried to make identity an issue. It really wasn't an issue because all this occurred at the defendant's house, and four of the five charges dealt with items seized at a house while the defendant was there from the room that he lived in. Seeing no further questions, I'll sit down. Thank you. Rebuttal. Briefly, Your Honor. On the issue of causation for the government's substantial interference, Mandy Malbrew was present for trial. We had a defense investigator in the hallway. The government had a defense investigator in the hallway, and she left. I think the causation is established pretty directly by the earlier threat of perjury, the immunity order not protecting her from that perjury charge, and then by the time that we are ready to call her, she is gone. I don't know how more direct of a causal record we could have made there. We renewed the motion to quash in front of the district court judge. He denied that. So he says it simply was you could have called her and you didn't. Your response is by the time you wanted to call her, she was no longer there? She was no longer there. Did you ask for a continuous so you could get her? We did not. Did you subpoena her? I know that we requested subpoenas for her, but I don't believe that the subpoena return was in the record. But she left the courthouse, and she was just not there when the time came for us to call her. She lived with her client. She did. Who told her about the agent's testimony? Nobody. She didn't know? No. So the argument is that the use of immunity was sufficient at one point but insufficient when? No. I think that in the briefing I was looking at this a little differently than I should have, which is that Kalagna's testimony was most significant for his admission that he had threatened her with a perjury prosecution when he met with her outside of the grand jury, and that use of immunity didn't cure it. I think the court should look at Biankowski, which is the Fifth Circuit case, where the court found that the causation was stopped, where the AUSA assured the witness before trial that she wouldn't be prosecuted for perjury. So I think what we would ask for is for a remand to the district court to allow the government to decide whether or not to assure Mandy that they won't prosecute her for perjury, and if they choose not to do that, to quash the indictment, because I think that the decisional dynamic for this trial has been irreparably harmed by the fact that she wasn't available to us. But what in addition to the use of immunity was – I mean, if you give her use of immunity and you say just don't lie, what's wrong with that? What's wrong with that is that the agent has already told her, if you say what you told me, which is documented in her affidavit, the agent recounted what she told him, which was the guns are mine, the drugs are mine. If you say what you told me, you will be committing perjury. And use of immunity that does not protect her from a prosecution for perjury leaves her with the threat from the government agent, I'm the one who refers cases. If you say what you are planning to say, I can refer you for prosecution. I think that's absolutely inappropriate. It precluded us from calling her as a witness. On the issue of the harmlessness of the error, the government spent a lot of time talking about the drug evidence, but we're still left with the weakness of the evidence on the gun count. That gun count triggered a significant mandatory minimum for our client. I think the evidence that he possessed it rather than Mandy was particularly weak, and for that reason Mandy's testimony would have been very crucial. The fact that she had told the agent that she purchased that gun for self-protection because she had been kidnapped while selling drugs elsewhere, the fact that she was selling drugs elsewhere was corroborated by her arrest and ultimate conviction for that. Are there no further questions? Thank you. Thank you, counsel. The court will take this matter under advisement. We call the next case.